CASE v CONSUMERS POWER COMPANY

Docket No. 112707. Argued March 8, 2000 (Calendar No. 2). Decided July 26, 2000.

Kenneth and Diana Case, dairy farmers, brought an action in the Barry Circuit Court against Consumers Power Company, alleging that stray voltage from Consumers' wires depressed milk production on their farm. The trial court, Patrick H. McCauley, J., instructed the jury that electricity is inherently dangerous and, therefore, the defendant was required to inspect and repair its electrical lines. The jury returned an award for the plaintiffs. The Court of Appeals, DOCTOROFF and FITZGERALD, JJ. (CORRIGAN, C.J., concurring), affirmed. 230 Mich App 547 (1998) (Docket No. 191733). Consumers appeals.

In an opinion by Justice YOUNG, joined by Chief Justice WEAVER, and Justices TAYLOR and MARKMAN, the Supreme Court *held*:

The general standard of care is always reasonable care, and it is for the jury to determine whether the defendant's conduct in a given case fell below that standard. The instruction in this case, which imposed an obligation to inspect and repair, was improper, and the error was not harmless.

1. Instructions should include all the elements of a plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them. They must not be extracted piecemeal to establish error, however. Even if somewhat imperfect, instructions do not create error requiring reversal if, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury. Reversal for instructional error will obtain only where failure to do so would be inconsistent with substantial justice.

2. Ordinarily, it is for the jury to determine the specific standard of care that should have been exercised by a defendant in a given case, although the court may decide the specific standard of care if it is of the opinion that all reasonable persons would agree or there is an overriding legislatively or judicially declared public policy. In this case, the trial court concluded that it was bound to instruct the jury under the standard articulated in *Schultz v Consumers Power Co*, 443 Mich 445 (1993). The disputed instruction was intended to

aid the jury in determining whether the defendant breached its duty to the plaintiffs to exercise reasonable care. *Schultz*, however represents a limited exception to the general rule that the jury determines the specific standard of care owed by a defendant in a particular case, and stray voltage simply does not qualify for such unusual treatment. Thus, the obligation to inspect and repair that was articulated in *Schultz* is inapplicable in stray-voltage cases. Rather, a jury must determine the precise actions required to meet the reasonable care standard in stray-voltage cases.

Vacated and remanded.

Justice CAVANAGH, joined by Justice KELLY, dissenting, stated that the requirement that providers of electricity reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects articulated in *Schultz*, is applicable in stray-voltage cases.

Although the nature of the danger presented by stray voltage is different than the nature of the danger presented by high-voltage electricity, a difference in the type of damage caused does not justify a departure from the *Schultz* standard. Stray voltage cases, like cases involving high-voltage electricity, involve harms caused by the properties of electricity. Regardless of whether the distribution of high currents of electricity through uninsulated wires in residential neighborhoods might cause death, while the low currents involved in stray voltage cases causes a lesser degree of harm, the level of harm caused does not alter the properties of the electricity itself. The distribution of electricity still requires special knowledge about how to direct and control a dangerous commodity. The questions of reasonableness, of what it means to inspect and repair, and what constitutes a hazard or defect leave room for interpretation by a jury.

In this case, all the critical issues were presented to and properly decided by the jury. The *Schultz* test should be applied and the jury's decision upheld. Further, the defendant had a fair opportunity to present its arguments. Under the *Schultz* instructions given, the jury could have concluded that the stray voltage detection required an unreasonable level of inspecting and repairing, or that inspecting and repairing would not serve the purpose of remedying hazards and defects. Thus, the jury had the opportunity to conclude that the defendant was not required to inspect and repair its wires under the circumstances.

Justice CORRIGAN took no part in the decision of this case.

*Martin W. Hable* for the plaintiffs-appellees.

*Warner, Norcross & Judd, L.L.P.* (by *Roger M. Clark, William R. Jansen,* and *Lori L. Gibson*), and *David A. Mikelonis* and *James E. Brunner,* co-counsel, for the defendant-appellant.

Amicus Curiae:

*David VanderHaagen* for Michigan Farm Bureau.

YOUNG, J. We granted leave in this case to address the proper standard of care applicable to providers of electricity in stray voltage cases. We conclude that the general standard of care is always "reasonable care," and it is for the jury to determine whether the defendant's conduct in a given case fell below that standard.

In this case, the trial court instructed the jury that electricity is inherently dangerous and, therefore, that defendant was required to inspect and repair its electrical lines. Because the instruction imposed an obligation to inspect and repair, it was improper. Further, we cannot conclude that the error in this case was harmless. Accordingly, we vacate the judgment for plaintiffs and remand for a new trial.

FACTS AND PROCEDURAL BACKGROUND

Plaintiffs Kenneth and Diana Case were dairy farmers during the 1970's and 1980's. In 1986, plaintiffs sold their dairy cows in a government buyout program. According to plaintiffs, the sale was induced by financial stress, which was a result of low milk production. In 1993, plaintiffs bought a new herd and

resumed dairy farming. Shortly after buying the new herd, plaintiffs concluded that their earlier milk-production problems were caused by stray voltage, and sued Consumers Power Company.

Stray voltage (technically referred to as neutral-to-earth voltage, or NEV) is an electrical phenomenon that can sometimes affect livestock, causing decreased milk production in dairy cows, among other problems. According to the parties, the voltage is so low that humans cannot detect it.[1] Stray voltage can have different causes, and stray voltage on a farm may be caused by a problem on the farm, a problem in Consumers' wires off the farm, or even a problem on another customer's property, such as a neighboring farm.[2] There is a procedure, sometimes referred to as "separating the neutrals," that, according to the parties, will eliminate all off-farm sources.

In this case, plaintiffs alleged that stray voltage depressed milk production on their farm until the neutrals were separated, whereupon milk production returned to normal. Defendant responded that it was not negligent, and that plaintiffs' milk-production problems were not caused by stray voltage. After hearing evidence regarding stray voltage and the problems on plaintiffs' farm, a jury rendered an award for plaintiffs, although the jury also found plaintiffs

---

[1] The parties agree that humans cannot detect the stray voltage at issue, but they use different terminology to explain that fact. While the parties have not specified the range of voltage involved, they generally refer to quantities of less than three volts.

[2] Indeed, Consumers argues that stray voltage exists even where there are no problems with the electrical system. Plaintiffs acknowledge that NEV is always present. However, they counter that if there were no problems with the system, the voltage would be so low that even cows would not be affected.

partially at fault (fifty-five percent). Defendant filed motions for directed verdict, judgment notwithstanding the verdict, and a new trial, all of which the trial court denied. Defendant appealed, and the Court of Appeals affirmed.[3] We then granted defendant's application for leave to appeal.[4]

The only issue before this Court concerns a jury instruction regarding the standard of care owed by Consumers to plaintiffs. Over Consumers' objection,[5] the trial court instructed the jury as follows:

> It was the duty of the Defendant in connection with this occurrence to use ordinary care for the safety of the Plaintiffs' property.
>
> It is well settled that electrical energy possesses inherently dangerous properties requiring expertise in dealing with its phenomena. Therefore Consumers Power Company has a duty to reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects. Consumers Power Company, being engaged in the transmission of electricity, is bound to anticipate ordinary use of the area surrounding the lines and to . . . appropriately safeguard an attendant risk. The test to determine whether a duty was owed is not whether Consumers Power Company should have anticipated a particular act from which the injury resulted, but whether it should have foreseen the probability that injury might result from any reasonable activity done on the premises for business, work or pleasure.

---

[3] 230 Mich App 547; 584 NW2d 375 (1998). Chief Judge CORRIGAN concurred separately in the decision to affirm the trial court.

[4] 461 Mich 881 (1999).

[5] Plaintiffs dispute whether Consumers objected to the entirety of this instruction. After reviewing the record, we conclude that Consumers objected to the instruction as a whole, properly preserving this issue. MCR 2.516(C).

STANDARD OF REVIEW

We review claims of instructional error de novo. In doing so, we examine the jury instructions as a whole to determine whether there is error requiring reversal. The instructions should include all the elements of the plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them. Instructions must not be extracted piecemeal to establish error. Even if somewhat imperfect, instructions do not create error requiring reversal if, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury. *Murdock v Higgins*, 454 Mich 46, 60; 559 NW2d 639 (1997). We will only reverse for instructional error where failure to do so would be inconsistent with substantial justice. MCR 2.613(A); *Johnson v Corbet*, 423 Mich 304; 377 NW2d 713 (1985).

ANALYSIS

To establish a prima facie case of negligence, a plaintiff must prove four elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation,[6] and (4) damages. *Schultz v Consumers Power Co*, 443 Mich 445, 449; 506 NW2d 175 (1993). The disputed instruction in this case was intended to aid the jury in determining whether defendant breached its duty to plaintiffs to exercise "reasonable care."[7] This is the so-called "general stan-

---

[6] As we explained in *Skinner v Square D Co*, 445 Mich 153, 162-163; 516 NW2d 475 (1994), causation is comprised of two separate elements: (1) cause in fact, and (2) legal, or proximate, cause.

[7] We will use the terms "reasonable care" and "ordinary care" interchangeably.

dard of care" applicable in negligence cases. See *Moning v Alfono*, 400 Mich 425, 443; 254 NW2d 759 (1977). Ordinary care means the care that a reasonably careful person would use under the circumstances. See SJI2d 10.02; *Detroit & Milwaukee R Co v Van Steinburg*, 17 Mich 99, 118-119 (1868) ("Negligence . . . consists in a want of that reasonable care which would be exercised by a person of ordinary prudence under all the existing circumstances, in view of the probable danger of injury").

Ordinarily, it is for the jury to determine whether a defendant's conduct fell below the general standard of care. Stated another way, the jury usually decides the *specific* standard of care that should have been exercised by a defendant in a given case. *Moning, supra* at 438. However, *the court* sometimes decides the specific standard of care if it is of the opinion "that all reasonable persons would agree or there is an overriding legislatively or judicially declared public policy . . . ." *Id.*

For example, in *Schultz, supra,* the plaintiff was electrocuted and died after an aluminum ladder he was using came too close to Consumers Power Company's 4,800 volt transmission lines. This Court recognized that "electricity possesses inherently dangerous properties" and that "electric utility companies possess expertise in dealing with electrical phenomena and delivering electricity." *Schultz* at 451. Accordingly, the *Schultz* Court held not only that electric utility companies owed a duty to exercise reasonable care in maintaining their wires, but that those companies are required to "reasonably inspect and repair wires and other instrumentalities in order to discover

and remedy hazards and defects." *Id.* at 451.[8] The Court in *Schultz* cited a number of cases in support of its conclusion, all but one of which involved the dangers of unintended contact with high-voltage electricity.[9] In this case, the trial court concluded that it was bound to instruct the jury consistently with the standard articulated in *Schultz*, although it expressed some reservation about doing so.[10]

---

[8] Although the *Schultz* Court couched its analysis in terms of "duty" ("pursuant to its duty, a power company has an obligation to reasonably inspect and repair wires"), it is clear that the Court actually was deciding the specific standard of care required in order to avoid breaching the general standard of "reasonable care." Thus, in *Schultz*, the Court made the very mistake warned of in *Moning* by blurring the distinctions between duty and the general and specific standards of care. *Moning, supra* at 438.

[9] See *Laney v Consumers Power Co*, 418 Mich 180; 341 NW2d 106(1983) (involving death by electrocution after contact with an electric power line); *Weissert v Escanaba*, 298 Mich 443; 299 NW 139 (1941) (involving severe shock and serious burns after contact with an electric light wire); *Mueller v Citizens Telephone Co*, 230 Mich 173, 177; 203 NW 129 (1925) (involving a short circuit that started a fire); *Black v Public Service Electric & Gas Co*, 56 NJ 63; 265 A2d 129 (1970) (involving death by electrocution when a crane touched an uninsulated high voltage wire); *Aguirre v Los Angeles*, 46 Cal 2d 841; 299 P2d 862 (1956) (involving severe electric shock and burns after indirect contact with lines carrying over 4000 volts); *Vieths v Ripley*, 295 NW2d 659 (Minn, 1980) (involving injury after indirect contact with uninsulated, unmarked, high voltage power lines); *Miner v Long Island Lighting Co*, 40 NY2d 372; 386 NYS2d 842; 353 NE2d 805 (1976) (involving severe injuries sustained after contact with a 7,620 volt uninsulated power line).

The only exception was a case involving a power outage on a chicken farm. *Rich Mountain Electric Cooperative v Revels*, 311 Ark 1; 841 SW2d 151 (1992). That case did not involve a general duty to inspect and repair. Instead, it involved a duty to remedy known damages caused by a storm.

[10] The trial court voiced concern on a number of occasions, but the following quote is representative:

I guess I've said this before—though I was concerned about the ruling under the *Schultz* case and I personally as a judge believed as the trier of this case that a less stringent rule should apply in the stray voltage cases, but I believed it was my duty and I was bound to follow the rule set forth by the Supreme Court, that I was not in a position to overrule and/or distinguish the *Schultz* case.

The "duty" of inspection and repair imposed in *Schultz* was intended to protect against the likelihood of serious injury or death. *Id.* at 453-454. Clearly, "reasonable care under the circumstances" represents a sliding scale. The more severe the potential injury, the more resources a reasonable person will expend to try and prevent that injury. Similarly, the greater the likelihood that a severe injury will result, the greater the lengths a reasonable person will go to prevent it. This principle is widely recognized.[11]

With this principle in mind, we think it beyond dispute that the dangers of high-voltage electricity (fire, electrocution, and death among them) are different in kind, and more severe, than the dangers of stray voltage. *Schultz* represents a very limited exception to the general rule that *the jury* determines the specific standard of care owed by a defendant in a particular case, and stray voltage simply does not qualify for that unusual treatment. Thus, we conclude that the obligation to inspect and repair that was articulated in *Schultz* is inapplicable in stray-voltage cases. Rather, we conclude that a jury must determine the

In her Court of Appeals concurrence, Chief Judge CORRIGAN shared the trial court's concerns regarding the disputed instruction. 230 Mich App 563-566. As further explained below, Chief Judge CORRIGAN was correct in noting that "[t]he scope of the duty should vary with the nature of the risk." *Id.* at 566.

[11] See *Dembicer v Pawtucket Cabinet & Builders Finish Co*, 58 RI 451, 455; 193 A 622 (1937) ("The greater the appreciable danger, the greater the degree of care necessary to constitute due or ordinary care"); *Wyrulec Co v Schutt*, 866 P2d 756, 762 (Wyo, 1993) ("[W]hat constitutes ordinary care increases as the danger increases. The concept of ordinary care accommodates all circumstances so that the degree of care varies with the circumstances."); *Webb v Wisconsin Southern Gas Co*, 27 Wis 2d 343, 350; 134 NW2d 407 (1965) ("The degree of effort, caution, or diligence required of a person to reach or attain the standard of ordinary care necessarily varies with the degree of hazard inherent under the circumstances").

precise actions required to meet the reasonable care standard in stray-voltage cases.

As the United States Supreme Court recognized long ago:

> There is no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The terms "ordinary care," "reasonable prudence," and such like terms, as applied to the conduct and affairs of men, have a relative significance, and cannot be arbitrarily defined. What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men, under a similar state of affairs. [*Grand Trunk R Co v Ives*, 144 US 408, 417; 12 S Ct 679; 36 L Ed 485 (1892).]

Plaintiffs argue that, even if the disputed instruction was erroneous, it was harmless. Indeed, as plaintiffs point out, most of the instructions read to the jury properly cited the ordinary care standard. However, the disputed instruction specifically required defendant to "inspect and repair" its lines to prevent stray voltage. The instruction thus took from the jury one of the crucial questions before it: in light of the level of danger and likelihood of injury posed by stray voltage, what actions was defendant required to take in order to prevent such injury? Put differently, the instructions failed to present one of Consumers' primary defenses to the jury—that Consumers had no obligation to discover and repair unknown stray volt-

age problems. The essence of Consumers' position was that it was acceptable to wait for problems to be reported before it had to take action. Under these circumstances, we must reverse the verdict and remand for a new trial. *Gapske v Hatch*, 347 Mich 648, 657-659; 81 NW2d 337 (1957).

By our analysis we do not intend to suggest that ordinary care regarding stray voltage requires less than reasonable inspection and repair, or that it requires more than merely waiting for problems to be reported. Rather, we simply acknowledge that the jury must decide on the basis of the evidence before it exactly what actions defendant was required to take under the circumstances of this case.

For the reasons stated, we vacate the judgment for plaintiffs and remand for a new trial consistent with this opinion.

WEAVER, C.J., and TAYLOR and MARKMAN, JJ., concurred with YOUNG, J.

CAVANAGH, J. I dissent. The majority adequately pinpoints the issue as being whether the trial court erroneously instructed the jury on the applicable standard of care in stray voltage cases. *Ante*, p 3. However, I disagree with the majority's conclusion that "the obligation to inspect and repair that was articulated in *Schultz* [*v Consumers Power Co*, 443 Mich 445, 449; 506 NW2d 175 (1993),] is inapplicable in stray-voltage cases." *Ante*, p 9. I further disagree that a remand for a new trial is warranted. All the critical issues in this case were presented to and properly decided by the jury. Therefore, I would affirm the decision of the Court of Appeals.

The disputed jury instructions in this case sprang from *Schultz.* In *Schultz,* a man was electrocuted while painting a house. He and his companion were moving a metal ladder toward the house when it came close to an uninsulated power line hanging near the house. The proximity of the ladder to the uninsulated wire created an arc of electricity that sent a current of electricity down the ladder and into the men. This Court held that, because of the special relationship between the decedent and the power provider, the power company had an affirmative duty to "reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects." *Id.* at 451. The special relationship arose out of the fact that electricity has inherently dangerous properties, and that special expertise is required to deal with electrical phenomena and the delivery of electricity. *Id.*[1]

---

[1] As *Schultz* explained:

Clearly, the relationship between the utility company and the decedent was sufficient to impose a duty under the circumstances. It is well established that those who undertake particular activities or enter into special relationships assume a distinctive duty to procure knowledge and experience regarding that activity, person, or thing. For example, a landlord must inspect a premises to keep it in a reasonably safe condition. *Samson* [*v Saginaw Professional Bldg, Inc,* 393 Mich 393; 224 NW2d 843 (1975)]; *Lipsitz v Schechter,* 377 Mich 685; 142 NW2d 1 (1966); 2 Restatement Torts, 2d, § 360, p 250. Physicians must keep reasonably abreast of current advances in their field. *Koch v Gorrilla,* 552 F2d 1170 (CA 6, 1977). Manufacturers must diligently inspect their products to discover lurking dangers. *Livesley v Continental Motors Corp,* 331 Mich 434; 49 NW2d 365 (1951); 2 Restatement Torts, 2d, comment, § 395, pp 326-332. Lastly, a carrier owes to its passengers the duty of discovering all detectable defects. *Trent v Pontiac Transportation Co, Inc,* 281 Mich 586; 275 NW 501 (1937).

Similarly, compelling reasons mandate that a company that maintains and employs energized power lines must exercise reasonable care to reduce potential hazards as far as practicable. First, electri-

The majority finds *Schultz* inapplicable to stray voltage cases partially on the basis that "the dangers of high-voltage electricity (fire, electrocution, and death among them) are different in kind, and more severe, than the dangers of stray voltage." *Ante,* p 9. As such, the majority argues, stray voltage cases should not receive the "unusual treatment" accorded to cases involving high-voltage electricity. *Id.* Although I agree with the majority that the nature of the danger presented by stray voltage is different than the nature of the danger presented by high-voltage electricity, I disagree that a difference in the type of damage caused justifies a departure from the *Schultz* standard.

Stray voltage cases, like cases involving high-voltage electricity, involve harms caused by the properties of electricity. The appellant's own brief demonstrates this point. According to the appellant, "[a]ll utilities, Consumers included, operate grounded power distribution systems, principally for safety reasons." Electricity must always return to its source to complete its circuit. If the "hot" wire breaks, the current will flow down the nearest ground line into the

---

cal energy possesses inherently dangerous properties. Second, electric utility companies possess expertise in dealing with electrical phenomena and delivering electricity. Lastly, although a reasonable person can be charged with the knowledge of certain fundamental facts and laws of nature that are part of the universal human experience, such as the dangerous properties of electricity, *Koehler v Detroit Edison Co,* 383 Mich 224, 231; 174 NW2d 827 (1970); Prosser & Keeton [Torts (5th ed)], § 32, pp 182-184; 3 Harper, James & Gray, Torts (2d ed), § 16.5, pp 405-408, it is well settled that electricity possesses inherently dangerous properties requiring expertise in dealing with its phenomena. Therefore, pursuant to its duty, a power company has an obligation to reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects. [*Schultz* at 450-451.]

earth, bypassing the break until it can reconnect with the neutral at some other point. The ground wire also provides a path to earth for excessive voltage surges from lightning strikes and other accidents.

Because of the inherently dangerous properties of electricity, these ground wires are provided, and must be reasonably maintained and inspected. But for the safety measure of the ground wires, events such as line breaks and lightning strikes would have catastrophic consequences.

Therefore, maintaining and inspecting the neutral ground wires is inextricably bound with those properties of electricity causing fires and electrocution, even though, ordinarily, the neutral wires only carry neutral-to-earth voltage (NEV) that is beneath the level of human detection.

Regardless of whether the distribution of high currents of electricity through uninsulated wires in residential neighborhoods might cause death, while the low currents involved in stray voltage cases causes a lesser degree of harm, the level of harm caused does not alter the properties of the electricity itself. The distribution of electricity still requires special knowledge about how to direct and control a dangerous commodity.[2] For example, if a utility worker were injured while climbing up a utility pole, it might be appropriate to apply a different standard than in *Schultz* because the injury would be unrelated to the properties of electricity. Conversely, the properties of electricity itself give rise to stray voltage injuries. Here, the jury found that the Cases suffered the loss of an entire dairy herd and nearly two million dollars

---

[2] See n 1.

in damages because of defendant's negligence in deal-
ing with the inherently dangerous properties of elec-
tricity. I cannot agree with the majority's attempt to
distinguish *Schultz*. Rather, the trial court appropri-
ately applied *Schultz* to this stray voltage action.

*Schultz's* requirement that providers of electricity
"reasonably inspect and repair wires and other instru-
mentalities in order to discover and remedy hazards
and defects" can fairly be applied in stray voltage
cases. *Id.* at 451. While reasonable inspection might
include detecting frayed wires or uninsulated wires in
residential neighborhoods, reasonableness might not
encompass detecting stray voltage. Similarly, power
providers could also argue that stray voltage is
neither a hazard nor a defect. The questions of rea-
sonableness, of what it means to "inspect and repair,"
and what constitutes "a hazard or defect" leave room
for interpretation by a jury.

The defendant argues that its liability should be
proportioned according to the degree of risk involved.
While I agree with the majority that the concerns are
different in stray voltage cases than in electrocution
cases, I disagree that those differences render a
*Schultz*-based jury instruction inadequate. Under the
majority's approach, trial courts will be left to deter-
mine when electricity acquires "dangerous" proper-
ties. *Schultz*, on the other hand takes note of the fact
that electricity has "inherently dangerous" properties,
and allows the jury to determine when inspection and
repair is reasonable. I would apply the *Schultz* test,
and would uphold the jury's decision.

The defendant also asserts that it was unable to
fully present its arguments. The majority agrees. *Ante,*
pp 10-11. Even if I were to agree with the majority

that *Schultz* creates too high a standard for stray voltage cases, I would disagree with the majority's harmlessness assessment. The defendant had a fair opportunity to present its arguments. As the majority acknowledges, the defendant's primary argument is that it need only act with reasonable care under the circumstances, and that it had no duty to inspect and repair its wires. Under the *Schultz* instructions given, the jury could have concluded that the stray voltage detection required an unreasonable level of inspecting and repairing, or that inspecting and repairing would not serve the purpose of remedying hazards and defects. Thus, the jury had the opportunity to conclude that the defendant was not required to inspect and repair its wires under the circumstances. I would affirm the decision of the Court of Appeals.

KELLY, J., concurred with CAVANAGH, J.

CORRIGAN, J., took no part in the decision of this case.